FORREST W. FENTRESS, d/b/a Fentress Trucking Company, Plaintiff-Appellee, v. TRIPLE MINING, INC., *et al.*, Defendants (John T. Henry *et al.*, Defendants-Appellants).

Fourth District    No. 4—93—1000

Argued April 12, 1994.—Opinion filed May 25, 1994.

Tracy A. Smith (argued), of Bloomington, for appellants.

George L. Chesley (argued), of Chesley & Wilson, of Bloomington, for appellee.

JUSTICE GREEN delivered the opinion of the court:

Plaintiff Forrest Fentress, d/b/a Fentress Trucking Company (Fentress), brought an action against defendants, Triple Mining, Inc., and its three officers and incorporators John T. Henry, George Dolly, and Carl S. Bachtold to recover $10,000 plus interest for a promissory note executed by Bachtold as an officer of Triple Mining payable to Fentress. Carl S. Bachtold was later dismissed from the suit. Following a bench trial, the circuit court entered a judgment in favor of Fentress against all remaining defendants, finding them jointly and severally liable in the amount of $21,778.28.

Defendants Henry and Dolly appeal, contending the circuit court erred in (1) piercing the corporate veil and holding them personally liable for a corporate debt; (2) finding that Bachtold had apparent authority to enter into the loan agreement with Fentress; (3) failing

to find that there was no consideration to support the note; and (4) failing to consider the affidavit and exhibits submitted at the post-trial hearing by Henry. We affirm.

On December 9, 1991, Fentress filed a second-amended complaint against Triple Mining, Henry, and Dolly. Count I against Triple Mining alleged that (1) on February 22, 1985, Triple Mining by its agent executed a promissory note in the amount of $10,000 in favor of Fentress; (2) the "note was given for value to-wit: the payment of $10,000 to Brian Perry Enterprises, Inc., for the use or benefit of defendant Triple Mining, Inc."; (3) Fentress owned and held the note; (4) Triple Mining refused to pay the $10,000 owed on the note; and (5) interest on the note was accruing at the rate of $3.84 per day.

Count II against Henry and Dolly realleged the allegations in count I and further alleged that (1) "Triple Mining, Inc., has never had any capital contributions made by the shareholders, has no assets, has never carried on business as a corporation, has never observed corporate formalities and has used any assets that it has ever acquired for the sole benefit of shareholders and not for corporate purposes"; (2) Henry, Dolly, and Bachtold were the incorporators and shareholders of Triple Mining; (3) Henry, Dolly, and Bachtold were the real parties in interest and have used Triple Mining as an alter ego to shield them from personal liability; and (4) the purported corporate entity should be disregarded and individual shareholders liability should be imposed.

Counts I and II sought a judgment against Triple Mining, Henry, and Dolly jointly and severally in the amount of $19,333.36 plus any additional interest that would accrue up to the date of judgment. Attached to the amended complaint was a copy of the promissory note dated February 22, 1985, in favor of Fentress in the amount of $10,000 signed "Triple Mining, Inc., Carl Bachtold." Henry and Dolly filed affirmative defenses, which in part asserted (1) that the promissory note attached to the second-amended complaint was nonexistent or void due to a total want and failure of consideration; and (2) Bachtold, the maker of the promissory note, had no authority to bind Triple Mining to the loan agreement.

The undisputed facts established that on November 21, 1984, Henry, Dolly, and Bachtold entered into a partnership agreement with Bryan Perry Enterprises, Inc., wherein Henry, Dolly, and Bachtold agreed to act as brokers to sell coal derivatives produced by Perry Enterprises in Kentucky. The agreement set forth that one-half of the net profits from the coal venture would be distributed to Perry Enterprises and the other half would be distributed to Henry, Dolly, and Bachtold. The agreement indicated that Henry, Dolly, and

Bachtold were to advance Perry Enterprises $15,000, which was to be repaid to Bachtold out of the share of net profits owed to Perry Enterprises. Apparently, Dolly advanced the $15,000 to Perry Enterprises. The evidence indicated that the coal venture with Perry Enterprises in Kentucky was the only coal venture in which Henry, Dolly, and Bachtold were involved.

On December 12, 1984, Henry, Dolly, and Bachtold formed an Illinois corporation known as Triple Mining, Inc. A corporate charter was obtained from the Secretary of State. Henry was president, Dolly was vice-president, and Bachtold was secretary and treasurer. There was evidence that Triple Mining was formed to carry on the coal venture established by the partnership agreement with Perry Enterprises and to limit any personal liability of Henry, Dolly, and Bachtold. There was some dispute as to the degree of corporate formalities maintained by Triple Mining and the amount of the initial capital paid into the corporation. Nonetheless, by action of the Secretary of State, Triple Mining was dissolved in 1986 for failure to file an annual report for the year 1985.

Prior to February 1985, Fentress became interested in providing the trucking transportation for the coal derivatives procured by Triple Mining from Perry Enterprises in Kentucky pursuant to their partnership agreement. On February 22, 1985, Fentress went to Kentucky with Bachtold and others to meet with Bryan Perry. Henry and Dolly were not present at that meeting. At that time, Fentress paid $10,000 to Perry Enterprises by check payable to Bryan Perry Enterprises, Inc. A preprinted promissory note in the amount of $10,000 dated February 22, 1985, was executed by Bachtold signed "Triple Mining, Inc., Carl Bachtold" in favor of Fentress. A "memo of receipt" signed by Bryan Perry and Carl Bachtold for Triple Mining, dated February 22, 1985, acknowledged the $10,000 "as payment in full per contract between Triple Mining, Inc., and Bryan Perry Enterprises, Inc., to secure permit and licenses" for the coal venture in Kentucky. Bryan Perry, Bachtold, and Fentress then entered into an agreement where Fentress was to truck the coal produced by the venture between Triple Mining and Perry Enterprises.

The evidence indicated that prior to February 22, 1985, Henry and Dolly never spoke to Bachtold about entering into a $10,000 loan agreement with Fentress, and there had never been a corporate resolution by Triple Mining authorizing Bachtold to borrow any money on behalf of Triple Mining.

Approximately two months after Bachtold executed the $10,000 promissory note, a second note evidencing the same $10,000 indebtedness as set forth in the first note, allegedly signed by Bach-

told for Triple Mining, was signed by Henry in the form "John T. Henry, President." By letter dated March 26, 1985, Henry, Dolly, and Bachtold demanded the return of the $25,000 advanced to Perry Enterprises. Subsequently, the coal venture in Kentucky failed and the $10,000 owed to Fentress pursuant to the February 22, 1985, note was never paid.

At the trial Forrest Fentress testified that (1) he lived in Farmer City and owned Fentress Trucking Company; (2) he had known defendant Henry for 25 to 30 years; (3) he had known defendant Dolly for 10 to 15 years; (4) in the later part of 1984 Henry talked to him about the coal venture in Kentucky; (5) he, Henry, Dolly, and Bachtold went on several trips to the Kentucky coal site to investigate the coal venture; (6) he was interested in the trucking aspect of the coal venture; (7) Henry introduced him to Bryan Perry; (8) he was led to believe that Perry, Henry, Dolly, and Bachtold were partners in the coal venture; (9) on February 22, 1985, he traveled to Kentucky with his wife, Bachtold, and a friend of his, Lyle Lindsey; (10) the purpose of the trip was to loan Triple Mining $10,000; (11) on several occasions he discussed the loan with Bachtold; (12) the February 22, 1985, meeting took place at Perry's office; (13) through discussions with Henry and Bachtold he understood that Triple Mining was related to the coal venture; (14) at the February 22, 1985, meeting it was discussed that Triple Mining needed $10,000 to secure permits to produce coal at the wildlife refuge; (15) he handed Bachtold a check for $10,000 which Bachtold handed to Perry; and (16) in return he received the promissory note.

Fentress further testified that (1) Bachtold obtained a preprinted promissory note from a bank in Kentucky and filled in the blanks; (2) he gave the original note to his attorney, which subsequently got lost; (3) he had a copy of the original note; (4) in March 1985, he had a conversation with Henry in his office and asked Henry to sign a note for Triple Mining for $10,000; (5) Henry signed the note in his presence as "John T. Henry, President"; (6) he did not have the original note but had a copy; and (7) subsequently, he had another conversation with Henry where Henry told him that once they "started moving coal out of there, the note would be paid."

On cross-examination, Fentress testified that (1) the check for $10,000 was made payable to Perry Enterprises; (2) he made the check payable to Perry Enterprises as an advance to Triple Mining to secure permits for the coal venture; (3) prior to February 22, 1985, Bachtold informed him that Triple Mining needed a $10,000 loan; (4) he never discussed the loan with Henry or Dolly; (5) he thought Bachtold was president or vice-president and could act on behalf of

Triple Mining; (6) approximately one or two months prior to February 22, 1985, Henry told him that he "probably shouldn't go" to Kentucky; (7) Bachtold and Perry told him that Triple Mining needed the $10,000 to secure permits for the coal venture; (8) subsequently, Henry advised him that the $10,000 was needed to secure permits; (9) in March or April 1985, Henry signed the second note evidencing the $10,000 indebtedness; (10) the second note was dated February 22, 1985; (11) several weeks after February 22, 1985, Bachtold brought him the second note because it contained a provision for the payment of attorney fees; (12) the second note had already been signed by Bachtold when he received it; (13) he expected that Triple Mining would pay the $10,000; (14) neither Henry nor Dolly asked him to loan Triple Mining $10,000; (15) he believed that the coal venture was valid; and (16) he admitted that no one guaranteed that there would be any profit from the venture and he never expected to receive payment from Henry or Dolly.

Henry testified that (1) in connection with the partnership agreement with Perry Enterprises, Dolly advanced $15,000 to Perry Enterprises; (2) $10,000 out of the $15,000 was to reimburse Bryan Perry for a loan he obtained to purchase the licensing permit for the coal venture; (3) $15,000 was to be repaid to Dolly when the first coal was shipped; (4) he admitted going to Kentucky on several occasions with Fentress but denied the trips were related to the partnership agreement with Perry Enterprises; (5) Triple Mining was formed to engage in the coal business; (6) to his knowledge Triple Mining never did any business with Perry Enterprises; (7) he admitted that at a deposition he stated that Triple Mining was formed to protect the incorporators from personal liability; (8) he, Dolly, and Bachtold spent approximately $1,000 in forming Triple Mining; (9) the attorney who helped form the corporation had all the books and corporate documents which he believed were given to Bachtold, who was the secretary-treasurer and registered agent; (10) he was not aware of the corporation ever maintaining a corporate bank account; (11) at the first organizational meeting at their attorney's office there was a corporate minute book; (12) he does not recall there ever being an annual meeting of shareholders; (13) the corporation was involuntarily dissolved in 1986; and (14) aside from the $1,000 it cost to form the corporation, no other funds were invested in the corporation.

Henry further testified that (1) he was never issued any stock certificates; (2) he did not pay for any stock; (3) at the organizational meeting using "boilerplate forms" they adopted a constitution and bylaws; (4) aside from the organizational meeting there were no other corporate meetings; (5) the corporation never filed a tax return; (6) to

his knowledge the corporation never filed an annual report; (7) to his knowledge the corporation never had the funds to pay the $10,000 note; (8) he discussed with Fentress the possibility of Fentress transporting the coal produced from the coal venture; (9) he introduced Fentress to Bryan Perry; (10) he acknowledged signing the second note at Fentress' request; (11) he did not recall telling Fentress when or how the note would be paid; and (12) he admitted that in March 1985 he, Dolly, and Bachtold in their *individual* capacities demanded the return of $25,000 from Perry Enterprises and that $15,000 of $25,000 related to Dolly's initial advancement to Perry Enterprises, but denied that the remaining $10,000 related to the note to Fentress.

In addition, Henry denied that Bachtold had authority to enter into a loan agreement on behalf of Triple Mining, but admitted that he signed the second note evidencing the $10,000 indebtedness as president of Triple Mining. Henry also admitted he initialled the agreement executed on February 22, 1985, by Perry, Bachtold, and Fentress engaging Fentress to truck all the coal procured by Triple Mining from Perry Enterprises.

On cross-examination, Henry stated that (1) he signed the second note for $10,000 because Fentress told him that the note was a loan to Bachtold; (2) prior to signing the note he had not known the note existed; (3) shortly before Fentress went to Kentucky in February 1985, he advised Fentress not to go and not to get involved with any business discussions with Bryan Perry; and (4) he also advised Bachtold not to go to Kentucky and meet with Perry. On redirect examination, Henry admitted that Triple Mining never passed any corporate resolutions regarding anything and that certain agreements were entered into without a corporate resolution.

Bachtold testified that (1) Triple Mining was formed in connection with the coal venture with Perry Enterprises; (2) when Triple Mining was formed he paid an attorney $30 or $35, Henry paid nothing and Dolly paid $35; (3) Triple Mining never had a shareholders meeting or board of directors meeting; (4) there was never a corporate bank account; (5) Triple Mining never filed an annual report or tax return; (6) Triple Mining never issued any share certificates; (7) corporate records were never kept; (8) the purpose of Fentress giving $10,000 to Perry Enterprises was to help Bryan Perry and guaranteed Fentress the trucking job; (9) he admitted signing the $10,000 note to Fentress; (10) he now did not believe he had a right to sign the note on behalf of Triple Mining; (11) he never discussed the loan with Henry or Dolly before February 22, 1985; and (12) Bryan Perry obtained the necessary permits with the $10,000 from Fentress. On cross-

examination, Bachtold denied ever having possession of the $10,000 check from Fentress to Perry Enterprises.

Dolly testified that in accordance with the partnership agreement with Perry Enterprises he advanced Perry Enterprises $15,000. In addition, Dolly acknowledged that Triple Mining never (1) held any corporate meetings; (2) issued any stock; (3) had a corporate bank account; (4) had any money other than the initial start-up costs; (5) filed any tax returns; or (6) filed an annual report. Dolly admitted the Triple Mining was engaged in the same coal venture as the partnership with Perry Enterprises, and the purpose of the corporation was to shield the incorporators from personal liability.

On July 19, 1993, the court entered judgment in favor of Fentress finding that the evidence warranted piercing the corporate veil and holding Henry and Dolly jointly and severally liable for the $10,000 note to Fentress. The court concluded that once the corporate veil was pierced, Henry, Dolly, and Bachtold became joint venturers and each was responsible for the activities of the other, provided there was authority or apparent authority by any one of the joint venturers to engage in certain activities. The court found that Bachtold had apparent authority to enter into the loan agreement with Fentress on behalf of Triple Mining, Henry, and Dolly, and that Henry affirmed the existence of the loan by signing the second $10,000 note as the president of Triple Mining.

■ Initially, Henry and Dolly contend that the court erred in piercing the corporate veil and imposing personal liability for a corporate debt. Generally, a corporate entity is considered separate and distinct from its officers, directors, and shareholders, who have limited liability for corporate debts. (*Gallagher v. Reconco Builders, Inc.* (1980), 91 Ill. App. 3d 999, 415 N.E.2d 560.) In *People ex rel. Scott v. Pintozzi* (1971), 50 Ill. 2d 115, 128-29, 277 N.E.2d 844, 851-52, the Supreme Court of Illinois discussed the doctrine traditionally known as "piercing the corporate veil" as follows:

"The concept of disregarding the corporate existence and imposing liability personally upon the real parties to a transaction is well established and is summarized in 19 C.J.S., Corporations, sec. 839, page 264: 'Where the director or officer is the alter ego of the corporation, that is, where there is such unity of interest and ownership that the separateness of the individual and corporation has ceased to exist, and the facts are such that an adherence to the fiction of separate existence of the corporation would sanction a fraud or promote injustice, such director or officer will be held liable for obligations of the corporation.' (See also, 18 Am. Jur. 2d, Corporations, sec. 15.) The concept has been

variously announced, defined, explained and applied in decisions of many State and Federal courts. (See annotations in 1 A.L.R. 610, 34 A.L.R. 597, and 63 A.L.R.2d 1051.) It has likewise been accepted and applied by the courts of this State for many years."

A number of factors are to be considered in determining whether the corporate entity should be disregarded, including undercapitalization; the disregard of corporate formalities such as absence of corporate records, failure to hold meetings, issue stock, pay dividends; and the nonfunctioning of the officers and directors, which indicate that the corporation is only a facade for the shareholders and officers. In addition, in the absence of fraud, there must be facts indicating that adherence to the corporate entity would promote an injustice. (*Gallagher*, 91 Ill. App. 3d at 1004, 415 N.E.2d at 564.) Here, Triple Mining was clearly undercapitalized and never observed any corporate formalities. Henry suggested that there may have been some initial corporate books or records, but none of the corporate officers were able to produce these documents at trial. The trial court could reasonably have inferred that these records did not exist or they would have been produced at trial. (*Berlinger's, Inc. v. Beef's Finest, Inc.* (1978), 57 Ill. App. 3d 319, 325, 372 N.E.2d 1043, 1048.) In any event, any initial organizational records would not have precluded the court from disregarding the corporate entity.

■ The individual defendants do not seriously dispute the failure of Triple Mining to follow the procedures and formalities of a corporation. Rather, they maintain that Fentress was never misled as to the fact that he was dealing with a corporation and not the individuals nor in regard to the assets or lack thereof of Triple Mining. Accordingly, the individual defendants maintain that the failure of the Triple Creek investors to proceed properly in their corporate endeavor did not cause an injustice to be inflicted upon plaintiff.

Here, no overt fraud in obtaining the loan was shown. However, plaintiff could reasonably have relied upon the corporation having at least some paid-in-capital with which to work. Moreover, the evidence showed that in attempting to obtain repayment from Perry Enterprises, the individual defendants sought to have that repayment made to them as individuals. The best interpretation which defendants can put on that is that they did not regard the existence of the corporation as being significant. The evidence was sufficient to support a determination by the circuit court that the element of injustice was proved.

We next consider Henry's and Dolly's contention that the evidence did not support a finding that Bachtold had authority to exe-

cute the $10,000 note on behalf of any others. In *Corn Belt Bank v. Lincoln Savings & Loan Association* (1983), 119 Ill. App. 3d 238, 243, 456 N.E.2d 150, 154, this court noted that under the doctrine of apparent authority an agent can bind a principal

> "when the principal has permitted the agent to assume such authority or held the agent out to the public as possessing such power. [Citation.] The conduct of the principal, whether it consists of affirmative action or of acquiescence, is a necessary element in the creation of apparent authority."

Henry and Dolly claim that here there was no evidence that Triple Mining either acted affirmatively or acquiesced giving an impression that Bachtold had authority to bind it to the loan agreement. In particular, Henry and Dolly note that the evidence established that (1) there was no corporate resolution authorizing the note; and (2) Henry advised Fentress not to get into a business discussion with Bryan Perry.

The evidence indicates that Henry, Dolly, Bachtold, and Fentress all discussed the coal venture in Kentucky with Perry Enterprises and that Triple Mining was formed in connection with the coal venture. Fentress traveled to Kentucky to investigate the coal venture with Henry, Dolly, and Bachtold. Henry introduced Fentress to Bryan Perry. Fentress had discussed the coal venture with Bachtold and knew Bachtold was an officer of Triple Mining. There were discussions indicating that Triple Mining needed to advance Perry Enterprises money for either a license or equipment to get the coal venture started. In consideration of all the circumstances, Fentress could reasonably have inferred that Bachtold had apparent authority to bind Triple Mining to the loan agreement. As noted by the circuit court, Henry later affirmed the loan agreement by signing the second note for $10,000 as president of Triple Mining.

The circuit court concluded that, in any event, once the corporate veil was pierced, Henry, Dolly, and Bachtold became joint venturers and were responsible for each other's activities, provided there was authority or apparent authority to engage in the activities. A joint venture can be implied by the circumstances and can be established by:

> " '[A]n association of such joint undertakers to carry out a single project for profit; that there must be a community of interest in the performance of a common purpose, a proprietary interest in the subject matter, a right to direct and govern the policy in connection therewith, and a duty, which may be altered by agreement, to share both in profit and losses.' " (*Baker Farmers Co. v. ASF Corp.* (1975), 28 Ill. App. 3d 393, 395, 328 N.E.2d 369,

372, quoting *Carroll v. Caldwell* (1957), 12 Ill. 2d 487, 496-97, 147 N.E.2d 69, 74.)

In addition, every member of a joint venture can be held liable to a third party for acts of the other joint venturers done in the course of the enterprise. *Tassan v. United Development Co.* (1980), 88 Ill. App. 3d 581, 588, 410 N.E.2d 902, 908.

Here, Henry, Dolly, and Bachtold were all involved for profit with the coal venture with Perry Enterprises in Kentucky. That coal venture was the only coal business with which they were involved. The evidence would support a finding that Henry, Dolly, and Bachtold were involved in a joint venture. The loan agreement with Fentress was clearly in furtherance of the joint venture. The $10,000 loaned to Perry Enterprises on behalf of Triple Mining was to be used to either procure a license to obtain the coal derivatives or for some expenses incurred in furtherance of the coal operations. The circuit court's determination that the note was issued with actual or apparent authority was fully supported by the evidence.

We summarily reject defendants' contention that the note was unenforceable for lack of consideration. Defendants contend that, even though Fentress testified that the $10,000 check he made payable to Perry Enterprises was for the benefit of Triple Mining to secure permits for the coal venture, the evidence indicated that the permits had already been secured with the $15,000 advanced to Perry Enterprises by Dolly shortly after the execution of the partnership agreement. Accordingly, defendants claim the benefit of the $10,000 loan agreement passed to Perry Enterprises and not to Triple Mining, but that makes no difference as far as the existence of the necessary consideration is concerned.

Consideration which is sufficient to support an ordinary contract is sufficient to support a note. (*Rybak v. Dressler* (1988), 178 Ill. App. 3d 569, 582, 532 N.E.2d 1375, 1383.) Thus, as with other contracts, consideration for a note exists when, as here, a benefit is conferred on a third person (*Affiliated Realty & Mortgage Co. v. Jursich* (1974), 17 Ill. App. 3d 146, 150, 308 N.E.2d 118, 122) or, also as here, when the maker of the note is indirectly benefited (*Burke v. Burke* (1980), 89 Ill. App. 3d 826, 828-29, 412 N.E.2d 204, 206-07). The elements of "consideration" have been described as follows:

> "Consideration may be given to the promisor or to some other person. It matters not from whom the consideration moves or to whom it goes. If it is bargained for as the exchange for the promise, the promise is not gratuitous. Consideration need not move from the promisee, and it need not be pecuniary or beneficial to the promisor. Consideration moving to the promisor may

be a benefit to a third person or a detriment incurred on his behalf." 11 Am. Jur. 2d *Bills and Notes* § 216, at 245 (1963).

Clearly, parting with $10,000 was a detriment to plaintiff and a benefit to Perry Enterprises, and Bachtold having at least apparent authority from defendants directed the $10,000 be given to Perry Enterprises. Defendants had the burden of negating the existence of consideration. (*Burke*, 89 Ill. App. 3d at 828-29, 412 N.E.2d at 207.) Thus, to the extent that indirect benefit to defendants is significant, defendants would have the burden of negating such indirect benefit. Although the evidence on the question of how the $10,000 was used was sparse, the circuit court was not required to conclude that defendants received no indirect benefit by way of the money being used to enhance the coal venture.

■ Finally, the affidavit submitted in support of defendants' post-trial motion recites many facts, some of which were not placed in evidence. However, the affidavit does not indicate they were newly discovered and not available at trial. A party seeking to overturn a prior judgment based on newly discovered evidence must show that (1) the evidence was discovered subsequent to the entry of the judgment; (2) due diligence was exercised to discover the evidence prior to the trial; and (3) the evidence was material and not just cumulative. (*Prudential Property & Casualty Insurance Co. v. Dickerson* (1990), 202 Ill. App. 3d 180, 185-86, 559 N.E.2d 854, 857-58.) The circuit court properly refused to consider the affidavit.

We affirm for the reasons stated.

Affirmed.

McCULLOUGH, P.J., and STEIGMANN, J., concur.