Donnie A. WARD et al.,
Plaintiffs-Appellees,

v.

Alan K. CAMPBELL, etc., et al.,
Defendants-Appellants.

No. 77–2503.

United States Court of Appeals,
Fifth Circuit.

Jan. 21, 1980.

---

Gregory J. Leonard, Asst. U. S. Atty., Macon, Ga., Leonard Schaitman, Frederic D. Cohen, Barbara A. Babcock, Asst. Atty. Gen., Appellate Sect., Civil Div., Dept. of Justice, Washington, D. C., for defendants-appellants.

Billy E. Moore, Edward W. Szczepanski, Columbus, Ga., for plaintiffs-appellees.

Before TUTTLE, VANCE and KRAV-ITCH, Circuit Judges.

VANCE, Circuit Judge:

■ This appeal is from a decision of the district court reversing the Civil Service Commission (CSC).[1] The CSC determined that the army properly found that the work performed by exterior electrical linemen and cable splicers entitled them to a classification of WG–10 as opposed to WG–11. Although the lower court correctly found that the relevant workers performed jobs that were different from the ordinary WG–10 employee, we must reverse its decision. In cases such as this one, the government does not have the burden of showing that the complaining employees perfectly fit the WG–10 classification. A showing of comparability of jobs and consistency of the classificatory scheme, like the one made by the CSC, is sufficient.

Prior to 1965, each agency of the federal government had its own grading system for determining the salaries of its blue collar employees. Wage rates often differed substantially among employees of different agencies doing essentially the same type of work in the same area of the country. To remedy the inequities and irrationality of the status quo the government undertook to develop a coordinated pay system.

This was a major undertaking, and the CSC had only partially completed the new Coordinated Federal Wage System (CFWS) by August 1968, when Fort Benning began to convert from the army's system (W–1 to W–15) to CFWS (WG–1 to WG–15). Since grading standards had not been developed for exterior electrical linemen and cable splicers, these workers were temporarily assigned WG grades equal to the grades they had occupied under the army's pay system, WG–11, pending adoption of the relevant new standards. Ward and eight other civilian employee plaintiffs were among this group of workers. In June 1973, the CSC classified electricians (high voltage) as WG–10.

While the CSC is responsible for establishing general grading standards, 5 U.S.C. § 5346(a), the CSC does not grade every conceivable blue collar job that does or might exist in the federal government. Rather, it creates grades and classifies some jobs in light of those grades. 5 U.S.C. § 5346. Although controlling in some cases, these classifications are generally illustrative, providing guidance for government agencies. A different job is performed by the individual agencies, such as the army. They are responsible for applying those general grading standards to individual positions and for placing particular jobs within grades. 5 U.S.C. § 5343(a)(4). At Fort Benning, this duty is entrusted to the civilian personnel office. In some cases, the discharge of this responsibility involves little agency discretion. When no published standard exactly covers a specific job, the agency is to grade the position consistent with published standards. 5 U.S.C. § 5346(b). This is accomplished by comparing a particular job with occupations covered in published standards. *See Federal Personnel Manual,* chapter 532, subchapter 6–4. This comparison, however, is not a necessarily generalized examination. If a job involves a number of different tasks, it is graded in accordance with "the highest skill and qualification requirements of the job." *Id.,* subchapter 6–5a(2), at 532–22.

On September 25, 1974, the civilian personnel office informed the plaintiffs that they were to be downgraded, since their work was more like that of an electrician (high voltage), WG–10, than like that of any WG–11 job. Plaintiffs and management officials then filed a formal protest with the army's Training and Doctrine Command (TRADCO). After studying the problem and conducting an independent analysis, TRADCO affirmed the decision of the Civilian Personnel Office. On May 15, 1975, plaintiffs received final notice of the personnel action.

Plaintiffs filed an adverse action proceeding against the army, 5 C.F.R. § 752 (1979), contending that their duties were "over and

---

1. Under the present statutory scheme enacted in 1978, employees aggrieved by an adverse agency action appeal to the Merit Systems Protection Board rather than to the Civil Service Commission. *See* 5 U.S.C. §§ 7513, 7701.

beyond" the duties described in the WG–10 standard. An evidentiary hearing before the Federal Employee Appeals Authority of the CSC was held on August 14, 1975. *See* 5 C.F.R. §§ 772.101, 772.307(b) (1978).[2] The hearing was unusual because the army did not attempt to defend its decision to downgrade plaintiffs. This posture reflects the conflict between the administration at Fort Benning and the army's personnel experts. With one exception, therefore, all witnesses testified that in their opinions plaintiffs should have been graded higher than the WG–10 level. The exceptional witness, predictably enough, was the position classifier at Fort Bragg. Unlike the other witnesses, however, he was a classification expert.

At the conclusion of the hearing, the examiner sought the advice of the Personnel Management and Evaluation Division (PMED), CSC's classification expert. PMED's opinion was that plaintiffs were properly classified as WG–10. This opinion was based on an examination of the different types of work performed by plaintiffs, including a comparison to the work performed by other blue collar employees of the federal government. Plaintiffs took exception to PMED's conclusion, but did not furnish additional or rebuttal evidence. The Appeals Authority adopted PMED's opinion in rendering its final decision, *see* 5 C.F.R. § 772.309(b) (1978), affirming the army's downgrading decision.[3]

Plaintiffs appealed the decision to the federal district court. It held that the CSC's decision was arbitrary, capricious and unsupported by substantial evidence. The CSC's decision was reversed, and plaintiffs were ordered to be reinstated to their previous grade. The CSC then brought this appeal.

■ The district court's decision must be reversed. First, the court mistakenly analyzed the case under both the arbitrary and capricious standard and the substantial evidence test. Judicial review of this classification decision, however, is limited to determining whether the classification decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1979).

■ Substantial evidence review is inappropriate here because the hearing held by the CSC was not mandated by statute. 5 U.S.C. § 706(2)(E) (1979) (substantial evidence review only in cases "subject to sections 556 and 557"). Except in the case of preference eligible employees, who are in a different class from plaintiffs, review is only required by the CSC's own regulations. 5 C.F.R. § 772.307(b). Accordingly, only 5 U.S.C. § 706(2)(A) (1979) review, not 5 U.S.C. § 706(2)(E) review, is appropriate. *See Camp v. Pitts*, 411 U.S. 138, 140–42, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Bank of Commerce v. City National Bank*, 484 F.2d 284, 289 (5th Cir. 1973), *cert. denied*, 416 U.S. 905, 94 S.Ct. 1609, 40 L.Ed.2d 109 (1974).

■ Second, the district court misconceived the issue in this case when it ruled that the army's decision was irrational. The court based this decision on the fact that plaintiffs' job skills differed from those described in the WG–10 standard. This is not the correct test.

Since plaintiffs' work is not exactly described by any of the CSC's standards, the court should have asked the question whether the army properly found that the plaintiffs' work was *more closely comparable to the WG–10 standard than to any other published standard.* The import of 5

2. Part 772 of title 5 of the *Code of Federal Regulations* was recently superseded by parts 1200, 1201, and 1202. *See* 44 Fed.Reg. 44820 (1979). This case, however, was adjudicated under the old Civil Service Commission scheme. *See* note 1 *supra.*

3. The effect of this decision, however, was not to reduce plaintiffs' pay immediately. They were to retain WG–11 pay "until future admin-

istrative pay increases for wage board employees exceed the rate [they] now hold. In addition, . . . [they] will receive one-half of the amount of [future pay] increase[s] for [their] regular grade until such time as the actual pay rate for your new grade equals or exceeds your retained rate.". Letter from George F. Schladensky to Donnie A. Ward (September 25, 1974), appendix at 15.

U.S.C. § 5346(b) is a requirement that the army's grading decisions be "in conformance with or consistently with published job standards." *See Federal Personnel Manual,* chapter 532, subchapter 6–4, at 532–21 ("For jobs not covered by published Commission standards, grades are determined by comparison with standards published for related occupations").

■ Plaintiffs had the burden of demonstrating that the army's comparability decision was arbitrary, capricious, or an abuse of discretion. *Albert v. United States,* 437 F.2d 976, 979, 194 Ct.Cl. 95 (1971). To carry this burden, plaintiffs had to show that the army's decision to downgrade their positions was either not "based on a consideration of the relevant factors" or amounted to a "clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).

The *Federal Personnel Manual* provides that in making a 5 U.S.C. § 5346(b) determination of comparability and consistency for jobs not covered by a published standard, an agency must consider four factors: (1) skill and knowledge, (2) responsibility, (3) physical effort, and (4) working conditions. *Federal Personnel Manual,* chapter 532, subchapter 6–5a(1)(b), at 532–21. The TRADCO decision demonstrates that the army carefully considered each of these factors in grading plaintiffs' work as WG–10.[4] Both the WG–10 and the WG–11 standards were compared. The "mixed job" nature of plaintiffs' work was also thoughtfully considered. *See id.,* subchapter 6–5a(2), at 532–22.

■ To demonstrate that the army's decision amounted to a clear error of judgment, it is not enough for plaintiffs to show that the demands of their jobs differed from the demands of the published WG–10

standard. Plaintiffs would have had to show that their work is more comparable to the WG–11 standard than the WG–10 one. This they failed to do. The record does not support the conclusion that plaintiffs' work entitled them to be graded at the WG–11 level.

REVERSED.

---

4. TRADCO agreed with plaintiffs that their work probably did entail more hazardous condition work than the average WG–10. As TRADCO correctly noted, however, this did not warrant a higher grade for plaintiffs; rather they were only entitled to receive differential hazard pay, if they were exposed to such hazards on a regular basis. *Federal Personnel*

*Manual Supplement* 532–1, appendix J. These hazards are also described in the WG–10 standard, under the heading, "Working Conditions." By statute, the regular presence of such conditions is to be taken into account in awarding differentials above normal salaries. 5 U.S.C. § 5343(c)(4).