**UNITED STATES of America,
Plaintiff,**

v.

**John Paul JONES, Jr., Georgia–Carolina Oil Company, GC Quality Lubricants, Inc., and Bay Street Corporation, Defendants.**

No. CIV.A. 501CV323S(HL).

United States District Court,
M.D. Georgia,
Macon Division.

June 4, 2003.

Brendan F. Flanagan, Columbus, OH, Walker Smith, Albert C. Lin, Washington, DC, for United States of America, plaintiff.

Linwood Robert Lovett, Mr., Macon, GA, for GC Quality Lubricants, Inc., Georgia–Carolina Oil Company, Bay Street Corporation, John Paul Jones, Jr., (an individual), defendants.

## ORDER

LAWSON, District Judge.

This matter is before the Court on Plaintiff's Motion for Summary Judgment [Tab 23]. The Court hereby grants, in part, and denies, in part, the Motion, as more fully set forth below.

## I. PROCEDURAL HISTORY

Plaintiff, the United States of America, filed its complaint in this Court on August 14, 2001. Plaintiff named as Defendants John Paul Jones, Jr., Georgia–Carolina Oil Company, GC Quality Lubricants, Inc., and Bay Street Corporation. Jurisdiction was founded on the presence of a federal question, the claims being brought under the federal Clean Water Act (hereinafter the CWA), 33 U.S.C.A. § 1321(b), and the Oil Pollution Act (hereinafter OPA), 33 U.S.C.A. § 2702(a).

Defendants own an oil processing facility that has on its premises several different types of tanks and holding facilities. The government contends that because of the nature of the business, Defendants are required to comply with certain sections of the Clean Water Act, most notably, the provisions requiring the facility to have on hand and available to any Environmental Protection Agency (hereinafter "EPA") inspector a Spill Prevention Control and Countermeasures ("SPCC") plan. The CWA also prohibits discharges of oil into navigable waters and provides for civil and criminal penalties for violations. The Oil Pollution Act, an act passed by Congress shortly after the Exxon Valdez oil spill in Alaska, allows the government, or the EPA, to hold responsible parties strictly liable for discharges and requires the responsible party to initiate removal operations to clean up any discharge of oil. If the responsible party cannot, or will not, clean up the discharge, OPA provides that the government can initiate the removal

operations using funds from a trust created by the Act and funded by special taxes. The government can then seek reimbursement from the responsible parties for all removal costs. This is the government's action to recover those costs and to impose penalties for Defendants' failure to comply with certain environmental provisions.

The government's complaint was brought in three counts: Count 1, OPA cleanup liability; Count 2, penalties for violating the CWA discharge provisions; and Count 3, penalties for violating the CWA Spill Prevention Control and Countermeasures plan provisions. On May 31, 2002, Plaintiff filed a Motion for Summary Judgment. Defendants responded on October 11, 2002. Plaintiff then replied to the Defendants' response on November 8, 2002.

Before ruling on the motion, the Court scheduled a hearing. The hearing was scheduled for April 3, 2003, but was continued to April 4, 2003 due to the tardiness of Defendants' attorney and the unavailability of Jones, who wished to be present at the hearing.

## II. STANDARD OF REVIEW

It is well established that the "party moving for summary judgment ... *'always* bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings" ... which it believes demonstrate the absence of a genuine issue of material fact.'" *Livernois v. Medical Disposables, Inc.*, 837 F.2d 1018, 1022 (11th Cir.1988) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Therefore, "before the burden shifts to the nonmoving party to go beyond the pleadings to demonstrate a genuine issue, the moving party must carry its burden of proof." *Id.* at 1022.

As the movant on the Motion for Summary Judgment and as the party that would bear the burden of proof at trial, Plaintiff's obligation is twofold: Plaintiff must show that no genuine dispute exists as to any material fact relevant to its claims and must produce such evidence as would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir. 1993). "'In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party.'" *Id.* (quoting *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1438 (11th Cir.1991) (en banc)). Moreover, when considering the Motion for Summary Judgment, the "'district court should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his [or her] favor.'" *Id.* (quoting *Four Parcels,* 941 F.2d at 1437).

## III. STATEMENT OF FACTS

Defendants in this case are: Bay Street Corporation ("Bay Street"), a wholly owned holding company; GC Quality Lubricants, Inc. ("GC"), a wholly owned and operating subsidiary of Bay Street; Georgia–Carolina Oil Company ("GCOC"), a wholly owned and non-operating subsidiary of Bay Street and owner of the property in question, and John Paul Jones, Jr. ("Jones"), an individual, a resident of Georgia, President and Treasurer of GC, Chief Executive Officer of GCOC, and Chief Executive Officer and seventy percent stockholder of Bay Street.

During a routine inspection of the GC facility, Randy G. Jackson, an EPA inspector, noticed what he thought were numerous violations of the CWA, including oil pooled on the ground and a lack of an adequate SPCC plan. He also noticed that

some of the oil pollution was flowing off the site and into a storm drain on the street. Jackson asked two men who were with him to follow the stream and determine its final outcome. These men determined that the stream flowed into a larger ditch and that this ditch emptied into a wetland that was adjacent to and drained into the Ocmulgee River, approximately 1–2 miles away.

In response to Jackson's findings, the EPA gave notice to Jones that he was required to remove the pollution. After deliberating for some time, Jones decided to defer to the government for initiation of the cleanup. The EPA ran tests on the site and began excavating the contaminated soil from numerous locations on the facility property. After expending over $1 million in more than a year of removal, and finding that the contamination was far worse than anticipated, the EPA decided to install sheet piling. Sheet piling consists of large plastic walls inserted into the ground around the contaminated site, followed by the application of a clay cap over the area to prevent further migration of pollution by restricting the flow of water through the contaminated ground. The total bill for the cleanup was $2,584,562.25, including $300,000 for the sheet piling remedy. The government initiated this lawsuit pursuant to OPA, seeking reimbursement of the money it expended and civil penalties under the CWA. The government now has moved for summary judgment on its claims.

## IV. CONCLUSIONS OF LAW

The Court will address the appropriateness of summary judgment with respect to each of the three counts of Plaintiff's complaint.

### A. Count I: OPA Cost Recovery Claim

Plaintiff's first claim seeks to recover the costs associated with the cleanup of the GC Facility under the Oil Pollution Act (OPA). 33 U.S.C.A. §§ 2701–2720 (2001). In order to find liability under OPA, the Court must find that there was: (1) a responsible party; (2) a vessel or facility; (3) a discharge of oil, or substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines; and (4) removal costs and damages. *See* 33 U.S.C.A. § 2702(a) (2001). Each of these four elements are discussed below.

#### 1. "Facility" and "Responsible Parties"

OPA defines "facility" as "any structure, group of structures, equipment, or device ... which is used for ... producing, handling, transferring, processing, or transporting oil." 33 U.S.C.A. § 2701(9) (2001). "Responsible party" of an onshore facility is defined as "any person owning or operating the facility." 33 U.S.C.A. § 2701(32)(B) (2001). In a suit brought under the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), the phrase "owned and operated" was interpreted by the Supreme Court of the United States as allowing two separate ways to establish that a person is a responsible party: as (1) an owner and/or (2) an operator. *United States v. Bestfoods*, 524 U.S. 51, 64–66, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998). Courts have recognized that the *Bestfoods* discussion of "owner and operator" liability should be applied to OPA. *See Harris v. Oil Reclaiming Co.*, 94 F.Supp.2d 1210, 1213 (D.Kan.2000). The parties agree that the *Bestfoods* analysis applies here. Applying the *Bestfoods* analysis, this Court must decide whether Jones or the Defendant corporations are owners or operators of a facility, as those terms are used in OPA.

The corporate Defendants admitted in their answer that they own and operate the facility at 1403 and 1414 Sixth Street

in Macon. (Answer ¶¶ 4, 5, 9, 13, 18.) The facility has been used, and is currently being used, for the purpose of manufacturing, blending, storing, handling, distributing, transferring, processing, or transporting oil. (Ans. ¶ 18; Jones Dep. at 7–8, Ex. D ¶¶ 3, 4.) GC is the operating company, GCOC owns the property on which the corporate offices of GC are located, and Bay Street is a holding company for GC and GCOC. (Jones Dep. at 37–39.) These admissions establish that the corporate Defendants are "responsible parties" for a "facility" under OPA.

In order to also find Jones liable as a "responsible party" as defined by OPA, the Court must also find that Jones was either an owner or an operator of the facility. 33 U.S.C.A. § 2701(32)(B) (2001). The Court will consider both the owner and the operator prongs separately.

### a. Jones' Liability as an Owner

█ In order to hold an individual derivatively liable as an owner of a facility that is otherwise owned by a corporation, the Court must look to corporate veil piercing considerations. *See Bestfoods,*

524 U.S. at 63–64, 118 S.Ct. 1876 (holding that when the corporate veil may be pierced, a parent company may be charged with derivative CERCLA liability for its subsidiary's actions).[1] There remains significant disagreement as to whether federal courts should apply state or federal common law to pierce the corporate veil under CERCLA's, and therefore OPA's, operator liability provisions.[2]

Regardless of whether the Court is to apply federal or state common law corporate veil principles, it is well settled under both federal and state law that the question of whether to pierce the corporate veil is rarely susceptible to summary judgment. *See, e.g., Hayes v. Collins,* 245 Ga. App. 704, 538 S.E.2d 785, 787 (2000) (noting the corporate veil piercing issues are normally for a jury); *American Protein Corp. v. AB Volvo,* 844 F.2d 56, 59 (2nd Cir.1988) (noting that the issue of corporate disregard is generally submitted to the jury). Courts considering whether to pierce the corporate veil generally consider such issues as gross undercapitalization, failure to observe corporate formalities, absence of corporate records and "whether

---

**1.** The analysis in *Bestfoods* should not be confined to the parent/subsidiary relationship and should be extended to hold an individual liable. "Person" is defined broadly under CERCLA to include "an individual." 42 U.S.C.A. § 9601(21) (1995). Courts have consistently held that shareholders can be subject to liability under CERCLA. *See, e.g., United States v. Amtreco, Inc.,* 809 F.Supp. 959 (M.D.Ga.1992), *Briggs & Stratton Corp. v. Concrete Sales,* 20 F.Supp.2d 1356 (M.D.Ga. 1998).

**2.** *Compare, e.g., United States v. Cordova Chem. Co.,* 113 F.3d 572, 584–85 (6th Cir. 1997) (Merritt, J., concurring in part and dissenting in part) (arguing that federal common law should apply), *vacated on other grounds, Bestfoods,* 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998); *Lansford–Coaldale Joint Water Auth. v. Tonolli Corp.,* 4 F.3d 1209, 1225 (3rd Cir.1993) (arguing that federal

common law should apply), *with e.g., Cordova,* 113 F.3d at 580 (applying state common law), Richard G. Dennis, *Liability of Officers, Directors and Stockholders under CERCLA: The Case for Adopting State Law,* 36 Vill. L.Rev. 1367 (1991) (arguing that state common law should apply). In *Redwing Carriers Inc., v. Saraland Apartments,* 94 F.3d 1489 (11th Cir.1996), the United States Court of Appeals for the Eleventh Circuit applied state common law to determine whether a limited partner should be held liable under CERCLA. *But see Cordova,* 113 F.3d at 585 n. 1 (Merritt, J., concurring in part and dissenting in part) (arguing that applying state law in cases involving partnerships is "not necessarily inconsistent with applying federal law in claims involving subsidiary corporations, however, since the danger of corporations creating subsidiary partnerships, as compared to subsidiary corporations, in order to evade CERCLA liability is fairly attenuated").

the corporation is merely a facade for the operations of the dominant stockholder." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484–85 (3rd Cir.2001) (identifying factors deemed "fairly typical of the genre").

■ Here, issues of fact exist, for example, with respect to whether Jones used corporate funds for personal expenses or whether the money applied to Jones' personal expenses served as repayment for loans made by Jones to the company. Therefore the determination as to whether Jones is derivatively liable as a responsible person cannot be decided as a matter of law and Plaintiff is not entitled to summary judgment on that issue.

### b. Jones' Liability as an Operator

In order to hold that a person is an operator, the Court must decide if the person "is someone who directs the workings of, manages, or conducts the affairs of the facility." *Bestfoods*, 524 U.S. at 66, 118 S.Ct. 1876. The Court sharpened this definition for purposes of CERCLA's, and therefore OPA's, concern with environmental contamination by stating that "an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* at 66–67, 118 S.Ct. 1876. Although *Bestfoods* involved the parent/subsidiary corporation relationship, the analysis has been applied in many cases to hold an individual shareholder or director liable under CERCLA if he himself operates a facility, rather than merely directs the business of the corporation. *See Browning–Ferris Indus. of Illinois, Inc. v. Ter Maat*, 195 F.3d 953, 956 (7th Cir.1999). In *Ter Maat*, the United States Court of Appeals for the Seventh Circuit reversed a district court decision and held that a president of a corporation could be personally liable as an operator of a landfill because he personally performed certain acts with respect to the landfill, not merely because he directed the business of the corporation.

On remand, the district court in *Ter Maat* examined specific instances when the president of the corporation crossed the line from merely directing the business of the corporation into personally performing the facility's environmental compliance decisions. *See Browning–Ferris Indus. of Illinois, Inc. v. Ter Maat*, 2000 WL 1716330, *1–2, (N.D.Ill., Nov. 8, 2000). The court noted that "the line between a personal act and an act that is purely an act of the corporation is a fine one." *Id.* at *1. If the individual "did not merely direct the general operations of [the corporations], or specific operations unrelated to pollution, but supervised the day-to-day operations of the [facility where the pollution occurred] ... then he would be deemed the operator." *Id.* The court found that the shareholder in *Ter Maat* had negotiated numerous contracts directly related to the pollution in question. *Id.* The court also found that the individual had personally communicated with the city, county and state concerning environmental permits. *Id.* Also, the shareholder continuously held himself out as the operator when signing environmental permit applications. *Id.* Additionally, he was the contact for all legal matters relating to the site, and was personally involved in any correspondence with environmental authorities. *Id.*

■ Here, as in *Ter Maat*, the Court finds that Jones is directly liable as a responsible person because of his direction over the facility's activities and his involvement in the decisions about compliance with environmental regulations. Not only was Jones directly involved in the operations and the oversight of the operations of

the facility where the pollution occurred, he made all of the important decisions involving the facility. (Jones Dep. 15.) Ultimately everyone employed at the facility reported to Jones. (Jones Dep. 17.)

Also, even though he was not in charge of the day-to-day environmental compliance, Jones was the primary decision maker over the facility's compliance with environmental regulations. Jones was directly involved in the hiring of environmental consultants and communicated with them regularly about the facility's environmental compliance. (Jones Dep. 25–27, 53.) Jones also admitted that he was responsible for drafting the facility's 1997 SPCC plan in an attempt to bring the facility into compliance with the Georgia Environmental Protection Division (hereinafter GEPD) consent order. (Jones Dep. 21–24, 108, 147.)

Additionally, the GEPD met individually with Jones in 1995 to discuss ways to solve potential environmental problems, specifically an oily storm water discharge. (Jones Aff. ¶ 6.) After meeting with the GEPD, Jones personally hired a consulting firm to assist the company in getting into compliance with environmental regulations. (Jones Dep. 25–27, 53.) Jones also was the principal person in communication with the consulting firm, as well as the Macon Water Authority in 1996 when GC attempted to acquire a permit to discharge contained water into a storm sewer. (Jones Dep. 147.)

In view of the foregoing, the Court finds that there are no genuine issues of fact as to whether Jones exercised direction over the facility's activities and was directly involved in decisions involving environmental compliance. Therefore, the Court finds as matter of law that Jones is an operator of the facility and a responsible person for purposes of OPA liability.

### 2. "Discharge" or "Substantial Threat of Discharge" into "Navigable Waters"

In order for a responsible party to be held liable under OPA, Plaintiff must prove that there was a "discharge of oil, or substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines." 33 U.S.C.A. § 2702(a) (2001). The Court will address whether each of these elements is satisfied here.

#### a. Discharge or Substantial Threat of Discharge

OPA defines "discharge" as "any emission (other than natural seepage), intentional or unintentional, and includes, but is not limited to, spilling, leaking, pumping, pouring, emitting, emptying, or dumping." 33 U.S.C.A. § 2701(7) (2001). Plaintiff argues that GC admitted that spills have occurred at the facility. (Jones Dep. 134–35.) Defendants concede that there have been spills at the facility, but contend that none of these spills have been "off the property" and therefore were not contemplated by the statute. (Jones Dep. 134.) The Court finds that there were spills on the property and, therefore, as defined by the statute, there was a "discharge or substantial threat of a discharge." *See* 33 U.S.C.A. § 2701(7) (2001). Defendants' argument, supported by deposition and affidavit testimony, that the spills were not "off the property" is misplaced and will be considered by the Court when addressing the "into or upon the navigable waters" element.

#### b. Navigable Waters

Plaintiff argues here that the discharge was into a "navigable water." It claims that numerous witnesses observed a mixture of oily water running off the property, down the road, and into the city storm drain and a creekbed. Plaintiff also states that during the early stages of the investi-

gation, two men working with the EPA investigated the path of the runoff from the facility, and they concluded that the flow drained into the Ocmulgee River, which is undeniably a navigable water. They further claim that these findings are consistent with findings in Defendants' SPCC plan which provides: "An uncontained spill from the tanks would flow off the property into storm drains on Sixth Street. The drainage is to the southeast to storm drains that run to a drainage ditch south of Seventh Avenue. The ditch flows to a creek that flows to the Ocmulgee river." (Pl.'s Mot. Summ. J., Ex. J at 6.)

Defendants respond that Plaintiff has not offered verifiable evidence that the storm drain or creek into which the contaminants supposedly flowed lead to the Ocmulgee. In the alternative, Defendants claim that they have produced evidence, in the form of affidavits from Jones and Willis, showing that the flow would likely end up in a large drainage ditch or possibly in a strip mining area. The Court will not consider this affidavit testimony, however, because the Court finds it to be inadmissible expert testimony. The affidavit testimony is improper because it lacks foundation to support expert status. Therefore,

without evidence to support the contention that the water does not flow to the river, there is no genuine issue as to whether the discharge will flow to the Ocmulgee River.

OPA defines "navigable waters" as "waters of the United States." 33 U.S.C.A. § 2701(21) (2001). This definition is identical to the definition of "navigable waters" under the CWA, 33 U.S.C.A. § 1362(7), and cases interpreting the CWA have been used to interpret OPA. *See, e.g., Rice v. Harken Exploration Co.*, 250 F.3d 264, 268 (5th Cir.2001). The Court finds this case law persuasive and will therefore apply the CWA analysis to this OPA action.[3]

The EPA has defined "waters of the United States" as including "[a]ll waters that are currently used . . . in interstate or foreign commerce, interstate waters, including interstate wetlands, all other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands . . . the use, degradation, or destruction of which could affect interstate or foreign commerce . . . [and][t]ributaries of waters identified." 40 C.F.R. § 230.3(s) (2002). Federal courts have interpreted "waters of the United States" as used in the CWA to apply in "broad" terms.[4] *See United States v. Riv-*

---

**3.** There is some disagreement among courts that have interpreted "navigable waters" under OPA as to whether CWA case law interpretations should apply. *See, e.g., Sun Pipe Line Co. v. Conewago Contractors, Inc.*, 1994 WL 539326 (M.D.Pa. Aug. 22, 1994) (holding that the legislative history of OPA suggests that the scope of OPA is more narrow than CWA and therefore CWA case law should not be applied).

**4.** It should be noted that courts have articulated at least two limits to the expansive reach of the CWA: 1) CWA does not reach isolated wetlands, *see United States v. Riverside Bayview Homes*, 474 U.S. 121, 134, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), and 2) "any interpretation of OPA and CWA is limited only to those waters that Congress has the authority under the Constitution to regulate . . . since

both Acts were passed under authority of Congress to regulate interstate commerce." Kevin Batik, *OPA's Reach: The Geographic Scope of "Navigable Waters" Under the Oil Pollution Act of 1990*, 21 Rev. Litig. 419, 427–430 (2002); *see also Solid Waste Agency of N. Cook County v. United States Army Corps of Engineers*, 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) (reading CWA as written to avoid constitutional and federalism questions raised by EPA's interpretation of "navigable waters" to include an abandoned sand and gravel pit because it was inhabited by migratory birds).

In *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the Supreme Court identified three categories of activity that Congress can regulate under the Commerce Clause. Congress may regulate the channels of interstate commerce, instru-

*erside Bayview Homes, Inc.*, 474 U.S. 121, 133, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). In *Riverside Bayview*, the Court held that wetlands adjacent to a river are navigable waters under CWA. *Id.* at 139, 106 S.Ct. 455. Following *Riverside Bayview's* guidance that the term "navigable waters" is to be interpreted broadly, courts began to extend the term to encompass, for example, non-navigable tributaries of navigable-in-fact waters. *See, e.g., Conant v. United States*, 786 F.2d 1008 (11th Cir.1986) (holding that the CWA authorized the Corps to regulate wetlands adjacent to non-navigable tributaries of navigable waters); *United States v. TGR Corp.*, 171 F.3d 762, 765 (2d Cir.1999) (holding same). The Eleventh Circuit even held in a case similar to the instant case that a street's storm drainage ditch was a "tributary" and thus a "navigable water" because the ditch emptied into a canal and eventually into the Tampa Bay. *United States v. Eidson*, 108 F.3d 1336, 1342–43 (11th Cir.1997).

Despite the broad definition given to the term "waters of the United States," courts have placed limits on its interpretation. The Supreme Court limited the scope of the CWA in *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159, 174, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) (hereinafter *SWANCC*). The Court in *SWANCC* struck down the Corps' determination that "the water areas [of an abandoned sand and gravel pit] are used as habitat by migratory bird [*sic*] which cross state lines" and, therefore, were within its jurisdiction as a "navigable water." *Id.* at 164–65, 121 S.Ct. 675.[5] The Court reasoned:

It was the significant nexus between the wetlands and "navigable waters" that informed our reading of the CWA in *Riverside Bayview Homes* ... In order to rule for the [Corps] here, we would have to hold that the jurisdiction of the Corps extends to ponds that are not adjacent to open water. But we conclude that the text of the statute will not allow this.

*Id.* at 167–68, 121 S.Ct. 675. The Court continued: We said in *Riverside Bayview* that "the word 'navigable' in the statute was of 'limited effect' and went on to hold that § 404(a) extended to nonnavigable wetlands adjacent to open waters. But it is one thing to give a word limited meaning and quite another to give it no effect whatever." *Id.* at 172, 121 S.Ct. 675.[6]

Since *SWANCC* was decided, courts have struggled with the breadth of the term "navigable waters" under the CWA. Some courts have distinguished the opinion in *SWANCC* as applying only to "isolated waters." *See, e.g., Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 533–34 (9th Cir.2001) (holding that irrigation canals that had been polluted with herbicide were "navigable waters" because they receive water from natural streams and lakes and divert water to streams and

mentalities of interstate commerce, and activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce. *Id.* at 558–59, 115 S.Ct. 1624.

5. The Corps was applying part of the "migratory bird rule" it had adopted in an attempt to clarify the reach of its jurisdiction under CWA § 404(a). *See* 51 Fed.Reg. 41217 (1986).

6. It should be noted that *SWANCC* involved § 404 of the CWA. *SWANCC*, 531 U.S. at 162,

121 S.Ct. 675. This is the section of the CWA that requires a person to obtain a permit from the Corps before discharging any "dredged or fill" material into "navigable waters." *Id.* Regardless of the applicable section, "navigable waters" is defined as "waters of the United States" throughout the CWA. 33 U.S.C.A. § 1362(7) (2001). Therefore, analysis of any of the CWA sections that refer to "navigable waters" will apply to OPA, unless the court finds that the CWA interpretations should not apply to OPA.

creeks); *United States v. Lamplight Equestrian Ctr., Inc.*, 2002 WL 360652 (N.D.Ill. Mar.8, 2002) (finding that *SWANCC* did not effect a substantial change in the reach of the CWA). Other courts have held that the decision in *SWANCC* served to put a more limiting construction on the CWA. *See, e.g., F D & P Enter., Inc. v. United States Army Corps of Engineers*, 239 F.Supp.2d 509, 516 (D.N.J.2003) (holding that *SWANCC* substantially altered the meaning of "navigable waters" and requiring a substantial nexus beyond a mere hydrological connection); *In re Needham*, 279 B.R. 515, 518 (Bankr.W.D.La.2001) (holding that "a body of water is subject to regulation under the CWA if and only if the body of water is actually navigable or is adjacent to an open body of navigable water").[7]

---

7. In deciding that *SWANCC* served to substantially alter the meaning of "navigable waters," the courts in both *F D & P Enterprises* and *Needham* were construing the Fifth Circuit's interpretation of *SWANCC* in *Rice v. Harken Exploration Co.*, 250 F.3d 264, 269 (5th Cir. 2001). In *Rice*, the court applied the CWA navigable water analysis to OPA. *Id.* at 265. The court addressed whether an oil company was liable to a family for the damage to its land resulting from a series of small discharges that occurred over a considerable period of time. *Id.* The bodies of water that the family sought to protect as "navigable waters," were referred to in the record as intermittent streams which only infrequently contain running water. *Id.* at 270. The court first refused to extend "navigable waters" to include groundwater, and then held that it would be an "unwarranted expansion" of OPA to find that discharges onto land that only infrequently carried running water were discharges into navigable waters. *Id.* at 271. The court noted that "there is no evidence of any oil discharge into [the creek] or any other intermittent creek containing above ground water on the ranch; only that there were oil discharges into the ground, some part of which may have, over some undetermined period of time, seeped through the ground into ground water and thence into [the creek]." *Id.* "In short, there is nothing in the record that could convince a reasonable trier of fact that either [the creek] or any other intermittent creeks on the ranch are sufficiently linked to an open body of navigable water as to qualify for protection under OPA." *Id.*

Some courts interpreting *Rice* have concluded that the Fifth Circuit held that the body of water must be "actually navigable" to be a navigable water. However, this Court believes that the language in the *Rice* opinion, along with the manner in which the court applied its "significant nexus" analysis to the facts of that case, suggest that these courts have unnecessarily expanded the result in *Rice*. Although the case does use the "actually navigable" language, when read in context, the "actually navigable" language has limited impact: "[The] report does state that several surface water samples were taken in which petroleum hydrocarbons were found. But, *the presence of oil* does not grant jurisdiction under the Act. Instead, a body of water is protected under the Act only if it is actually navigable or is adjacent to an open body of navigable water." *Id.* at 270 (emphasis added). In other words, this Court interprets *Rice* to say: It is not the presence of oil that gives the Act jurisdiction, but it is the presence of oil in a navigable water that gives the Act jurisdiction. The court later suggested that the creek would be a navigable water, and thus OPA would apply, if there had been something in the record showing that the creek was *sufficiently linked* to an open body of water. *See id.* at 271. If the Fifth Circuit is expressing, as other courts contend it is, that OPA applies only to "actually navigable" waters, the court would not have focused on whether there was a *sufficient link* to an open body of navigable water in determining whether there was a navigable water.

In *United States v. Lamplight Equestrian Center, Inc.*, 2002 WL 360652 (N.D.Ill. Mar. 8, 2002), the court stated that the requirement in *Rice* that waters are to be "actually navigable" is probably only *dicta* because the court held that there was only a discharge onto dry land. *Id.* at *5. The court noted that the proper analysis for determining CWA jurisdiction is "whether there is a significant nexus" between the wetlands at issue and the navigable waters. *Id.* at *6. The court held that "a tributary need not have a direct connection to the navigable water, but may be linked through other connections two or three times removed from the navigable water and still be subject to the Corps' jurisdiction." *Id.* at *8.

The Court believes a complete reading of *SWANCC* reveals that the Supreme Court actually had no intention of defining "navigable waters" as narrowly as courts have done in cases such as *Needham* and *F D & P Enterprises.* In *SWANCC,* the Court was concerned with the Corps of Engineers' determination that an abandoned sand and gravel pit was a navigable water because "the water areas are used as habitat by migratory bird [*sic*] which cross state lines." *SWANCC,* 531 U.S. at 164–65, 121 S.Ct. 675. This "migratory bird rule" was the only focus of the decision in the case. *See id.* at 167, 121 S.Ct. 675. Any other interpretive language in the case was merely *dicta. See Lamplight Equestrian Ctr., Inc.,* 2002 WL 360652, at *5. Therefore, the Court agrees with the Ninth Circuit's interpretation in *Headwaters* and finds that the decision in *SWANCC* did not serve to limit the CWA as narrowly as Defendants contend here.

Having concluded that the decision in *SWANCC* did not dramatically alter CWA case law, the Court also finds it appropriate to apply the Eleventh Circuit's decision in *United States v. Eidson,* 108 F.3d 1336 (11th Cir.1997), a case decided before *SWANCC,* to the facts of this case. In *Eidson,* the court held that a street's storm drainage ditch was a "tributary" and thus a "navigable water" because the ditch emptied into a canal and eventually into the Tampa Bay. 108 F.3d at 1342–43. In *Eidson,* pollution was being discharged into a storm sewer. *Id.* The flow then proceeded into an open drainage ditch where it then flowed under a street and into a large drainage canal that ran parallel to the road. *Id.* The sewer, the ditch, and the canal were all part of a storm discharge system that was designed to discharge storm water into a tributary of the Tampa Bay. *Id.* The Eleventh Circuit held that this flow was sufficient to establish that the drainage ditch was a tributary of a navigable water and thus was a "water of the United States" under the CWA. *Id.* The court noted that "to hold otherwise and allow polluters to contaminate this drainage system would defeat the intent of Congress and would jeopardize the health of our nation's waters." *Id.* at 1343.

█ Here, the pollution was seen flowing off of the property and into a storm sewer on the street. (Bristol Decl. ¶ 5; Jackson Decl. ¶¶ 5–7.) The pollution then flowed into a large drainage ditch that ran beside the road. (Pl.'s Mot. Summ. J., Ex. J at 6.) It then flowed into a creek and eventually into the Ocmulgee River. *Id.* As did the court in *Eidson,* the Court finds that the flow of pollution into the storm drainage system that leads to a tributary of the Ocmulgee River is a discharge into a "navigable water." Furthermore, the Court finds that there are no genuine issues of material fact on the question of whether the discharge was into a navigable water.

### 3. Removal costs

Each party deemed responsible for an oil discharge is liable for the removal costs incurred by the United States. 33 U.S.C.A. §§ 2702(a) & 2702(b) (2001). "Removal costs" means the costs of removal that are incurred after a discharge of oil has occurred. *Id.* at § 2701(31). Responsible parties are liable for all costs, including interest on unpaid removal costs and attorney's fees incurred in recovering removal fees. *Id.* at § 2715(c).

Here, Plaintiff contends that there were removal costs incurred totaling $2,584,562.25. The Defendants do not contest these costs, except to the extent their affirmative defenses apply. Therefore, the Court finds that there were "removal costs" incurred by the United States.

### 4. OPA Claim Conclusion

As discussed above, the Court finds that there are no genuine issues of material fact as to whether each Defendant was a "responsible party" of a "facility" where there was a "discharge" of oil into a "navigable water" resulting in the United States incurring "removal costs." Therefore, summary judgment on the OPA claim in favor of Plaintiff is proper. However, the issue of the amount of costs for which Defendants are liable remains pending, as explained in the portion of this Order addressed to Defendants' affirmative defenses.

### B. Count 2: CWA Discharge Claim

■ The CWA prohibits "[t]he discharge of oil or hazardous substances (i) into or upon the navigable waters of the United States ... in such quantities as may be harmful." 33 U.S.C.A. § 1321(b)(3) (2001). "Such quantities as may be harmful" means discharges of oil that "violate applicable water quality standards" or "cause a film or sheen upon or discoloration of the surface of the water." 40 C.F.R. § 110.3 (2002). "Any person who is the owner, operator, or person in charge of any ... facility from which oil or a hazardous substance is discharged ... shall be subject to a civil penalty in an amount up to $25,000 per day of violation." 33 U.S.C.A. § 1321(b)(7)(A) (2002). If the violation is found to be on or after January 30, 1997, but before August 19, 2002, the penalty shall be $27,500 per day. 40 C.F.R. § 19.4 (2002). Civil liability under the CWA is strict. *Kelly v. United States EPA*, 203 F.3d 519, 522 (7th Cir.2000).

The elements of the CWA claim are similar to the elements already discussed, under OPA, except for the "such quantities as may be harmful" element. *Compare* 33 U.S.C.A. § 1321(b)(3) (2001) *with* 33 U.S.C.A. § 2702 (2001). With respect to the quantity of the discharge, Plaintiff

claims that Jackson witnessed "oily water" migrating off the facility and into the storm drains. (Jackson Decl. ¶¶ 5, 7, 11.) Defendants fail to address the issue, except for their contention that the CWA does not apply because the discharge was not into "navigable waters." Therefore, the Court finds that there is no genuine issue of material fact as to whether the quantity of discharge was harmful.

The Court incorporates its findings set forth in the previous discussion on Defendants' liability under OPA and concludes that Plaintiff has shown as a matter of law that Defendants are responsible parties with respect to a facility from which oil in harmful quantities has been discharged into navigable waters. Thus, the elements of the CWA discharge claim are satisfied and Plaintiff's Motion for Summary Judgment is hereby granted on count 2, the CWA discharge claim. The amount of penalty to be assessed remains for determination.

### C. Count 3: CWA SPCC Plan Claim

Within the CWA, Congress charged the EPA to promulgate oil pollution prevention regulations. 33 U.S.C.A. § 1321(j)(1)(C) (2001). These SPCC regulations "establish procedures methods and equipment and other requirements for equipment to prevent the discharge of oil from non-transportation-related onshore and offshore facilities into or upon the navigable waters of the United States." 40 C.F.R. § 112.1(a) (2002). Onshore facilities that are engaged in "producing, gathering, storing, processing, refining, transferring, distributing or consuming oil and oil products, and which, due to their location, could reasonably be expected to discharge oil in harmful quantities" into or upon navigable waters must abide by these regulations. *Id.* at § 112.1(b).

These regulations require the owner or operator of the facility to prepare and implement an SPCC Plan that must be certified and prepared in accordance with good engineering practices and must meet the requirements set forth in 40 C.F.R. § 112.7. *See* 40 C.F.R. § 112.3(a), (d) (2002). These requirements include the installation of containment and/or diversionary structures to prevent the discharged oil from reaching navigable waters, periodic testing of above-ground tanks, and the following of spill prevention and containment procedures for tank loading and unloading. 40 C.F.R. § 112.7 (2002). Any person found to be in violation of these SPCC regulations shall be liable for a civil penalty in an amount up to $25,000 per day, 33 U.S.C.A. § 1321(b)(7)(C) (2001), and up to $27,500 per day for violations after January 30, 1997, but before August 1, 2002. 40 C.F.R. § 19.4 (2002).

Plaintiff claims that there have been numerous violations of the SPCC regulations, including the inadequacy of Defendants' SPCC Plan. Plaintiff contends that on three different occasions, an EPA inspector entered the site and was unable to obtain a copy of an adequate SPCC Plan from Defendants. Plaintiff claims that any plan Defendants did have was not certified and prepared in accordance with good engineering practices. Defendants contend that they had at all times an adequate SPCC Plan that was available to the EPA inspectors. Defendants further contend that they made every effort to draft an adequate SPCC Plan.

■ The Court grants summary judgment in part on this claim because it is undisputed that the 1996 plan was not "certified" by an engineer as required by 40 C.F.R. § 112.3(d). (GC Dep. at 107.) But the Court finds that fact issues remain as to how long these violations continued. Therefore, this determination, along with the determination of amount of penalty imposed, will remain pending.

## V. AFFIRMATIVE DEFENSES

Defendants raised three general affirmative defenses to the claims brought by the government: failure to state a cause of action, mootness, res judicata. Defendants also raised three OPA specific affirmative defenses: inconsistency with the National Contingency Plan (hereinafter NCP), reasonableness of costs, and lack of notice/presentment. Except for the defense of inconsistency with the NCP, Defendants have failed to address their affirmative defenses. Plaintiff contends that, by not contesting the remaining defenses, Defendants have essentially conceded that summary judgment in Plaintiff's favor should be granted as to these defenses. Because Defendants have not offered any evidence in support of the affirmative defenses of failure to state a cause of action, mootness, res judicata, reasonableness, and lack of notice/presentment, the Court finds that Defendants have failed to show that there are genuine issues of material fact that prevent judgment as a matter of law as to those defenses and Plaintiff is entitled to summary judgment as to them. The NCP inconsistency defense is discussed below.

With respect to the defense of inconsistency with the NCP, Plaintiff contends that the defense is not available to Defendants because OPA, unlike CERCLA, was purposefully drafted in such a way as to *not* provide the defense to defendants in OPA cost recovery actions. Defendants contend that under OPA the government must act consistently with the NCP, and therefore, cannot act arbitrarily and capriciously.

Recovery of removal costs is addressed in OPA as follows: "[E]ach responsible party for a vessel or facility from which oil is discharged, or which poses the substan-

tial threat of a discharge of oil, into or upon the navigable waters ... is liable for the removal costs and damages specified in subsection (b) that result from the incident." 33 U.S.C.A. § 2702(a) (2001). "The removal costs referred to in subsection (a) of this section are-(A) all removal costs incurred by the United States ...." 33 U.S.C.A. § 2702(b) (2001). Courts have recognized that this express language expands the government's ability to recover *all* costs of any removal action and not just necessary costs. *United States v. Hyundai Merchant Marine Co.*, 172 F.3d 1187, 1191 (9th Cir.1999).

■ The OPA cost recovery provision differs from the cost recovery provision incorporated in CERCLA. In drafting CERCLA, Congress chose to limit the government's ability to recover costs incurred during removal actions to those costs that "are not inconsistent with the national contingency plan." 42 U.S.C.A. § 9607(a)(4)(A) (1995). Under OPA, however, the government can sue to recover "all removal costs incurred by the United States." 33 U.S.C.A. § 2702(b)(1)(A) (2001). The "not inconsistent with the National Contingency Plan" language was not incorporated into OPA. Thus, Defendants cannot limit the government's recovery of costs merely by showing that its actions were inconsistent with the National Contingency Plan.

■ But to say that the government has unlimited power to recover any costs is also unfounded. Defendants may subject the EPA's removal actions to judicial review under the Administrative Procedures Act (hereinafter APA). Under the APA, courts have the authority to review a final agency action to determine, among other things, if the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.A. § 706(2)(A) (1996). The "final agency action" in this case is the removal action

taken by the EPA. As another court has explained the application of the APA to recovery of oil removal costs: "Recovery under OPA is not wholly unlimited, however. The government concedes that the general standard of the Administrative Procedure Act applies to its actions in seeking to prevent or contain an oil-spill: the United States may recover its costs unless its actions were arbitrary and capricious." *Hyundai Merchant Marine*, 172 F.3d at 1191. Under the APA, the standard of review for agency decisions is arbitrary and capricious. *Id.* Therefore, Defendants are effectively correct in stating that the removal costs are not recoverable if they are ruled to be arbitrary and capricious. The Court will apply this standard and will follow the CERCLA cases in making the determination.

■ In a Fifth Circuit decision, that court held that when agency decisions are challenged under the "arbitrary and capricious" standard, the burden is on the challenging party, and to carry this burden the challenging party must show that the agency's decision was either not based on a consideration of the relevant factors or amounted to a clear error of judgment. *See Ward v. Campbell*, 610 F.2d 231, 235 (5th Cir.1980). Here Defendants rely on the NCP to support their contention that the government's actions were arbitrary and capricious. Defendants argue that Plaintiff failed to follow several NCP regulations in preparing for and in implementing the removal action: they failed to determine the extent and nature of the pollution, to describe removal alternatives, to keep the responsible party informed, and to keep and maintain documentation on all actions taken. Also, Defendants contend that the choice of sheet piling was not based on a detailed remedial assessment and was not cost-effective. Defendants further contend that the decision to

use sheet piling instead of fully removing all the pollution did not remediate the threat in its entirety. A finding for Defendants on these issues might be sufficient to show that the government's removal methods amounted to clear error of judgment and, therefore, were arbitrary and capricious.

The Court finds that Defendants have demonstrated that issues of fact exist with respect to whether the EPA's removal decisions either were not based on consideration of the relevant factors or amounted to clear error of judgment. Therefore, to the extent that Defendants seek to use the government's inconsistency with the NCP to establish that the government's actions were arbitrary and capricious, summary judgment on the NCP inconsistency affirmative defense must be denied.

## VI. CONCLUSION

In view of all of the foregoing, the Court hereby finds as follows:

The Court finds under Count 1 that Plaintiff has shown as a matter of law that Georgia–Carolina Oil Co., GC Quality Lubricants, Inc., Bay Street Corporation and John Paul Jones, Jr. were responsible parties; that a discharge of oil into navigable waters occurred; and that removal costs were incurred. Therefore, Plaintiff's Motion for Summary Judgment is granted as to Count 1 for the recovery of costs associated with the cleanup of the GC Facility under the Oil Pollution Act. However, the Court denies Plaintiff's Motion for Summary Judgment insofar as it applies to Defendants' affirmative defense that Plaintiff's removal efforts were inconsistent with the National Contingency Plan. Therefore, the question of the amount of costs to which Plaintiff is entitled to recover remains pending.

The Court finds under Count 2 that Plaintiff has shown as a matter of law that

a discharge of oil occurred as contemplated by the CWA. Therefore, Plaintiff's Motion for Summary Judgment is granted as to Count 2 on the CWA discharge claim. However, the amount of penalty to be imposed as a result of Defendant's unlawful discharge remains to be determined.

The Court finds under Count 3 that Plaintiff has shown as a matter of law that Defendants failed to have an adequate Spill Prevention Control and Countermeasures Plan in place. Therefore, Plaintiff's Motion for Summary Judgment is granted as to Count 3. However, the amount of penalty to be imposed as a result of Defendant's violation of the SPCC plan requirements remains to be determined.

Plaintiff's Motion for Summary Judgment is granted as to Defendants' affirmative defenses of failure to state a claim, mootness, res judicata, reasonableness, and notice/presentment. Plaintiff's Motion for Summary Judgment is denied as to Defendants' affirmative defense of inconsistency with the National Contingency Plan.